(30 Misc. Rep. 400.)

### THIRD NAT. BANK OF SYRACUSE v. KEEFFE et al.

(Supreme Court, Special Term, Onondaga County. February, 1900.)

1. FRAUDULENT CONVEYANCES—INTENTION TO DEFRAUD—PROOF—SHARES IN JOINT-STOCK COMPANY—EVIDENCE.

The title to real estate was taken in the name of a third party, and a joint-stock company was formed to sell it. Twenty shares of the stock were taken by defendant A. K., and the rest by various other parties,— some for a valuable consideration, and other shares without consideration. Defendant A. K. claimed that he was the original purchaser of the land and formed the company, while the plaintiff sought to levy on the shares as the fraudulently concealed property of J. K., a brother of A. K. A. K. was crippled, had never attended to any business, and could not satisfactorily explain where he obtained all the money he claimed to have paid for the land. J. K. was a man of varied business experience, had formed several joint-stock companies before, paid the secretary of the state the fee for incorporating the company, and induced various parties to take shares of stock, but took no shares in his own name. *Held*, that the evidence showed that J. K. was the original purchaser of the land, and also sufficiently proved an intention to defraud his creditors to subject such shares as were not purchased for a valuable consideration to plaintiff's execution.

2. SAME—TITLE TO LAND—INSOLVENT DEBTOR—PROOF OF FRAUD.

The fact that an insolvent debtor took the title to land in the name of a third party, and had the title pass through the hands of three other friends, each holding it for a few years, without consideration, is sufficient proof of

an intention to defraud his creditors to subject the land to an execution to satisfy a judgment against such debtor.

3. BONA FIDE PURCHASER—NOTICE—EQUITIES.
Where a contract to purchase shares in a joint-stock company was made without notice of any equities in favor of the plaintiff, a levy on such shares by plaintiff to satisfy a judgment against the original organizer of the company is subject to such purchase.

Action by the Third National Bank of Syracuse against John C. Keeffe and others to subject certain property held by the other defendants to the payment of a judgment against John C. Keeffe, on the ground that he had secretly transferred it to defraud his creditors. Judgment for plaintiff.

George W. O'Brien and R. N. Wilson, for plaintiff.

McGowan & Stolz, for defendants Arthur J. Keeffe and others.

William F. Rafferty, for defendants John C. Keeffe and others.

A. H. Sheldon, for defendants Syracuse Rapid-Transit Ry. Co. and others.

HISCOCK, J. The property out of which the plaintiff seeks to have its judgment satisfied consists of real and personal property, and its source, so far as the present action is concerned, its character, and the present location of the apparent title thereto, are as follows: March 22, 1887, one Fannie M. Hamilton, through her husband and agent, William T. Hamilton, conveyed two pieces of real estate situate upon or near the shores of Onondaga Lake to one Edward Kanaley, for the purchase price of $3,500. Shortly after such conveyance a corporation known as the Syracuse Land & Steamboat Company was organized, with a capital stock of $10,000, divided into 100 shares, to which one of said parcels of land was conveyed by said Kanaley. Said shares of said capital stock were originally issued, 40 shares to said Kanaley, 20 shares to one Thomas Ryan, 20 shares to the defendant Arthur J. Keeffe, and 20 shares to the firm of Friedel & Gebhardt, or its conceded representatives. Nobody paid anything for the stock so issued to him, except said Friedel & Gebhardt, who paid 80 cents on the dollar for what was issued to them as aforesaid. Subsequently 20 shares of the stock issued to Kanaley were sold and transferred to Friedel & Gebhardt, or their representatives, who paid 80 cents on the dollar for it. These 40 shares of stock have since remained in the ownership and possession of said firm or its assignees, and is not in any way involved in this suit. Subsequently Kanaley transferred 12 of the 20 shares remaining in his name to the defendant Arthur J. Keeffe. He was allowed to retain 8 shares for his own benefit. He subsequently parted with it, and no question is made about it herein. Subsequently Thomas Ryan transferred the 20 shares standing in his name to Arthur J. Keeffe, who thus became the apparent owner of 52 shares of stock. Subsequently, and before the commencement of this action, he transferred 51 shares thereof to the defendant Hawley, retaining the title to 1 share. These 52 shares of stock are in question and the scrip therefor is in the possession of the court. Arthur J. Keeffe paid nothing for the 32 shares transferred to him as aforesaid by Kanaley and Ryan, and Hawley paid nothing upon the trans-

fer of the 51 shares to him. The Syracuse Rapid-Transit Railway Company has made a contract with said defendant Keeffe to purchase said stock for $10,000, and has already paid $2,000 and upwards upon said contract price. Kanaley retained the title to the other parcel of land conveyed to him by Mrs. Hamilton as aforesaid for several years, when, upon the request of Arthur Keeffe, he transferred it, without any consideration, to one Hughes; said Hughes, after retaining title thereto for several years, conveyed it, without any consideration, to one Mason; and said Mason, after some time, without any consideration, conveyed it to the defendant Arthur Keeffe, who now holds the legal title thereto, subject to condemnation proceedings which the city of Syracuse heretofore instituted for acquiring a small portion thereof.

It is the claim of the plaintiff that said real estate, which I have thus traced down to the present condition, was purchased and paid for by John C. Keeffe, and that the legal title thereto was conveyed to Kanaley upon the request of said Keeffe, and to enable him to keep it and the proceeds of it away from his creditors, and that inasmuch as the title of no purchaser, innocent and for value, intervenes between said conveyance to said Kanaley and the present ownership of said 52 shares of said stock and said remaining piece of real estate, it (the plaintiff) can still have the payment of said judgment out of said property.

I have no difficulty in finding that the indebtedness covered by plaintiff's judgment existed against said Keeffe at the time of the transactions involved, and that he was at that time insolvent and unable to pay his debts. The more serious and perplexing controversy has arisen over the question whether John Keeffe was the original, actual purchaser of said real estate, taking it in the name of Kanaley, or whether his brother, the defendant Arthur Keeffe, was such purchaser. Concededly, Kanaley was not the real purchaser of this property, and never paid anything for it. In taking the title thereto, and in doing what he did, he concededly acted either for John or Arthur Keeffe, and the determination of this lawsuit very largely depends upon the decision as to which one he did so represent. Each of the brothers has attempted, in the most positive and unqualified manner, to demonstrate, by his own evidence and otherwise, that he was the purchaser, and that the other one was not. The dispute has involved an investigation of the original purchase of the real estate, and of the organization and conduct of the land and steamboat company above referred to, which is necessarily connected with and involved in the ownership of the real estate. Neither brother has appeared in the case in an altogether enviable light. John Keeffe has openly taken the position that, being the purchaser of this property, he did take it in the name of Kanaley, for the purpose of keeping it away from his creditors. Arthur Keeffe has taken the position that, having the custody and care of the real estate, and being the confidential agent and representative of Mrs. Hamilton to sell it, he sought to purchase it of her in a secret and underhanded manner, through Kanaley, for the lowest price possible. Likewise, in the attempt to prove that he was the purchaser, and his brother not, each of the said

defendants has testified to things, some of which it is difficult to reconcile with reason. A careful consideration, however, of all the evidence which has been given, leads me to adopt the theory that John Keeffe, rather than Arthur, was the purchaser of the property from Mrs. Hamilton, and the subsequent promoter and organizer of the stock company. I am aided in reaching a conclusion by the undisputed fact that Kanaley did not in fact purchase this property and organize this company, but that he acted for one of the brothers; and I, therefore, in effect, have it before me simply to decide which brother presents the least improbable or more probable theory. I shall not attempt to review all of the details of the evidence which lead me to my conclusion, but shall, as briefly as possible, review some of the more prominent features:

Down to and after the date of purchase, March 22, 1887, the two brothers were upon friendly terms. John Keeffe was the older, and much more prominent and experienced in business. He had, to some extent, at least, looked after his brother, the other defendant, who was crippled in the use of one of his hands; procuring for and giving him employment of various kinds. He had been reputed, at least, to be a man of considerable means, whereas Arthur had not. He was and had been connected with various corporations and the management thereof, whereas Arthur had never had any experience, outside of that derived from acting as a prison guard, or as a foreman upon municipal work, or as clerk for other people. Under such circumstances, I think it was much more likely that John should conceive of and carry out the plan of purchasing this property, and then of marketing all or part of it through the organization of a stock company. The preponderance of evidence given by witnesses other than the two brothers is in favor of John's contention. Mr. Hamilton, who acted for his wife in the sale and transfer of the real estate, says that it was John who made the purchase of him, and that Arthur had nothing to do with it. James Keeffe, another brother, who loaned $1,750, which was ultimately used in paying for the land, says that he made the loan to John, and not to Arthur, as claimed by the latter. Thomas Ryan says that he became a party to the organization of the stock company, and took 20 shares of its stock, at the request and upon the solicitation of John, and that, when he subsequently transferred this stock to Arthur, he did so upon the representation of the latter that John wanted it done. Kanaley and the witness Friedel, who conducted the purchase of the 40 shares of stock which were paid for, upon the whole gave evidence which, if it does not indicate that John was the purchaser and promoter, certainly contradicts very materially at points the claim of Arthur that he was such purchaser and promoter, and that John had nothing to do with it. These are all of the witnesses who at important points came in contact with the original purchase and incorporation. Others have been sworn as to subsequent events and various admissions by one or the other of the brothers; giving evidence which it is impossible to reconcile, and which I shall not attempt to do. Of the main witnesses above mentioned, James Keeffe, is evidently and openly in sympathy with his brother John. Friedel has

no apparent preponderance in the dislike which he bears for each brother.   And the witness Hamilton, whose evidence is of especial importance, seems to have no bias or possible interest in the outcome of the suit, outside of the fact that his wife has a comparatively small claim against John Keeffe.   Again, the evidence which John gives with reference to the payment for the property seems to be more probable than that given by his brother.   His version is that he paid the $3,500 purchase money with $100 in cash and his note for $3,400, and that immediately he went to work to pay this $3,400 note, through borrowing $1,750 from his brother James, and through procuring the discount of two notes, aggregating $1,750, made by Kanaley and indorsed by Mrs. Hamilton and himself, and that the proceeds of such loan and discount were used to retire his first original obligation for $3,400 to Hamilton, by paying an outstanding obligation of the Hamiltons for about $2,800, and accounting for the balance of the $3,500 to Hamilton.   His theory, as well as that of his brother Arthur, involved the fact that ultimately substantially all of this purchase price was paid with the $3,200 realized from the sale of 80 shares of the stock of the corporation to Friedel and Gebhardt.   The explanation by this defendant of the details which resulted in the final payment and retirement of his original $3,400 note to Hamilton is by no means free from confusion and variations, but I can understand how originally he did give his note for $3,400 to Hamilton as evidence of his contract to purchase, and to be paid and taken care of in some roundabout and indirect manner thereafter to be devised, rather than at some given date to be directly and specifically paid, as might ordinarily be expected of a promissory note.   The explanation of Arthur Keeffe of the manner in which he paid for this land is, to my mind, tinged with the greater improbability, and subject to more criticism.   The borrowing of this $1,750 of the brother James Keeffe is an important detail in the evidence of each brother upon this subject.   In addition to the fact that John is corroborated, and Arthur contradicted, by James, who concededly loaned the money, Arthur is also contradicted as to one of the details which he incorporated in his evidence by the witness Salmon, whose evidence was correct, beyond any question. Further, Arthur's story involves the use by him in this purchase at two different times of $750 and $300, respectively, in cash, which he had been carrying around in his pocket, as claimed by him, for some indefinite period from a year down.   The fact, commented upon by his counsel, that the notes given by Kanaley, and discounted at the Robert Gere Bank, with which to procure money to apply upon this purchase price, were indorsed by John Keeffe, whose indorsement was secured by a mortgage upon his property, does not seem to me to especially contradict John's theory.   The fact that he indorsed the notes would seem not to indicate that he had nothing to do with the matter.   The fact that his indorsement was secured by a mortgage which would inure to the benefit of the bank could be very easily accounted for by prudence, and a desire for security upon the part of the bank officers.   Neither does the fact, if it is true, that $1,000 of the before-mentioned loan were paid to James Keeffe by a note made and indorsed by Kanaley and John Keeffe, and discounted at the Third

National Bank, seem to especially help Arthur. John Keeffe was an indorser upon that note, and he evidently at that time had credit with that bank. The mere fact that Arthur Keeffe carried the teller's check over to James is not important. He well may have done that at the request of John. There are other conceded facts which it is difficult to reconcile with a finding that John had nothing to do with the purchase and with the incorporation, as claimed by Arthur. He seems to have paid the bill for filing the certificate of incorporation in the office of the secretary of state, and for a time, at least, he took a prominent part in the meetings and conduct of the affairs of the corporation. I am not able to account, upon the theory of John's position, satisfactorily or logically, for all the things that Arthur has been doing during these years; for the fact that he has held the title to and controlled this scrip for so long a time; for the fact that he has held the title to, and largely controlled the use and occupation of, the remaining parcel of real estate for so long a time,—all without any apparent protest from John. Of course, a possible explanation may lie in the fact that John had let go the title to this property in a manner which prevented him from recovering it, and that, feeling himself helpless, he kept quiet until this litigation was instituted.

As I have said before, I have not felt compelled to account logically for all of the details and variations and contradictions in the evidence which has been presented to me. Two theories have been spread out before me, and I have been calld upon to select that which seemed more probable. While finding, as I have, that John Keeffe was the purchaser of the real estate, and the subsequent promoter and organizer of the stock company through which part of the real estate was marketed, I do not think that he became or was the owner of all of the stock which was subsequently lodged in the name of Arthur Keeffe, or that his creditors are entitled to all of the same. I have no doubt that John utilized Arthur in these matters, just as he claims he had in many others. This would be in accordance with John's general relations to Arthur, as claimed by him, and it would explain the latter's connection from time to time with the early history of these transactions. John is on record as testifying in some one of the numerous proceedings supplementary to execution that in the purchase of this property and in the organization of this company he was assisted by Kanaley and his brother. I have no doubt that, with the relations which these brothers then held with each other, it was the intention of the elder that the younger should get some benefit from this scheme, as a recompense for his services and assistance. Kanaley, without any question, was allowed to keep 8 shares of the stock originally put in his name, as compensation or commissions, so called, for what he did. I think it is reasonable and sufficiently equitable to conclude that the 20 shares of stock originally placed in the name of Arthur were intended to be and to remain his as a compensation for his assistance. The stock at that time was not regarded nearly as valuable as it has since turned out to be, and, with the disposition and feeling which John swears he had towards Arthur at that time, it would be natural that he should compensate him with fair liberality.

The only remaining question of substance is whether John Keeffe, having purchased this property, placed it and the proceeds of it in the names of other people, with the intention of keeping it away from his creditors, and especially this plaintiff. I think he did. It is difficult to account for all that he did in the line of operating through other people upon any other theory. While he might for some reason wish to take the real estate temporarily in the name of Kanaley, and while he might desire to organize a stock company, as the best method of manipulating and disposing of the real estate, it is difficult to understand why he should want all of the stock in the names of other people, unless he was attempting to conceal his connection with it and ownership of it completely from somebody; and it does not appear that he had any object in concealing it from anybody else than his creditors. Except for this desire to conceal his connection with the matter, he certainly would have been apt to take part of the stock of the corporation which he was organizing in his own name. I do not think that the plaintiff is chargeable with any such knowledge of the facts upon which this action is predicated as to be barred by the statute of limitations from maintaining it. The Rapid-Transit Company seems to have made its purchase of this stock in good faith, and without notice of any equities in favor of the plaintiff, and plaintiff's claims and judgment herein, therefore, must be subject to its contract of purchase. The defendant Hawley received from Arthur, by way of loan, $2,000 of the money which the latter had obtained from the railroad company upon the sale of this stock. That money is now under the control of the court, and the defendant is subject to the obligation to account therefor in this action upon the claims of plaintiff. The defendant Arthur Keeffe has apparently paid out taxes and made improvements upon some of this land. It is also charged that he has collected some rents therefrom.

In case the parties are not able to agree upon the account of these matters, an interlocutory judgment may be entered providing for a reference to take the same. Ordered accordingly.